UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

MELISSA SEARS,                          )
                                        )
            Plaintiff,                  )
                                        )
      vs.                               )          Case No. 2:11CV22 CDP
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
            Defendant.                  )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Melissa Sears's application for a period of

disability and disability insurance benefits under Title II of the Social Security Act,

42 U.S.C. § 401, *et seq*. and supplemental security income under Title XVI of the

Act, 42 U.S.C. §§ 1381, *et seq*.  Claimant Sears brings this action asserting both

physical and mental disability because of diabetes, wrist pain, back pain, asthma,

and depression.  The Administrative Law Judge concluded that Sears was not

disabled.  Because I find that the decision denying benefits was supported by

substantial evidence, I will affirm the decision.

## Procedural History

On March 21, 2007, Melissa Sears filed for Supplemental Security Income

payments, and on March 27, 2007, she filed for Period of Disability and Disability

Insurance Benefits.  The Social Security Administration denied her claims on July 6, 2007, and she filed a request for a hearing on July 27, 2007.  Sears then appeared and testified at a hearing on September 8, 2009.  The Administrative Law Judge issued an opinion on December 18, 2009, upholding the denial of benefits.  On January 13, 2011, the Appeals Council for the Social Security Administration denied Sears's request for review.  The ALJ's opinion thus stands as the final determination of the Commissioner.  Sears filed this appeal on March 14, 2011.

## Testimony before the ALJ

At the time of the administrative hearing, Sears was twenty-eight years old, 5'1 ½" tall, and weighed 126 pounds.  She was a high school graduate, and is married and has one child.  Her husband is a manager at Burger King.  As far as her daily functioning, Sears originally testified that she has trouble taking care of any household chores.  She later clarified that she could wash dishes, but not for longer than around thirty minutes.  She testified that she can cook meals as long as she can sit down while they are cooking, rather than standing in the kitchen the whole time.  Sears also does some vacuuming and sweeping, and she grocery shops with her husband as long as he carries the grocery bags.  The heaviest thing she can lift is her child, who weighs fourteen pounds.  She does take care of her child during the day by herself, but there have been a few occasions when relatives

have helped her if her blood sugars cause problems.  She also visits her family occasionally by driving for about an hour, but she tries not to drive because she almost got into an accident once because of a diabetes reaction.  She said that while she is at home, she is not up on her feet for long periods of time, which helps with her blood sugar and has decreased the frequency of various other illnesses.  She usually visits with family, watches television, reads, and checks her email.

Sears' last place of employment was a 3M factory cafeteria, in which she worked as a cashier.  She held that position periodically over a term of five years, up until sometime in 2007, at which point she had to stop working because of problems managing her diabetes.  She had also worked at a day care center for about three months until she was fired for not being dependable, as her health issues often kept her from getting to work on time.  Additionally, she worked for a company called MBS for about three years, boxing and sending book orders in the factory and taking orders in the call center.  MBS fired her for missing too much time at work, in part because of her diabetes, but also because of injuries from a car accident and work-related tendonitis in her wrist.  Sears also worked for a home decorating company for about one year, packaging and sending orders, but also left that job because of complications with her diabetes.

Sears testified about the physical problems from which she was suffering at the time of the hearing. She has diabetes, and she testified that she has trouble keeping her blood sugars in one range without getting too high or too low. Sears also had tendonitis in her wrist and had surgery for the problem, which improved her mobility. She also talked about pain in her neck from a car accident, describing it as her neck muscles tightening up from certain movements over an extended period of time. Additionally, Sears said that her colon doesn't work properly, perhaps as a result of her diabetes, and she has been to the hospital several times to relieve pain from constipation. She also discussed having asthma, but said that it hasn't been much of a problem. Finally, she testified that she had a staph infection that keeps returning, and she has had allergic reactions to the antibiotics used to treat it.

Sears had her daughter in February 2009, and she was able to get Medicaid to help with specialized diabetes treatments over the course of her pregnancy, including help from an insulin pump specialist. She had to see her doctor weekly, and she eventually had an emergency cesarean section.

The ALJ focused heavily on questions related to Sears's diabetes. She was diagnosed when she was eighteen months old and has used insulin since that time. Her blood sugar has gotten so high and so low that her insulin meter could not read

it.  The last time she was hospitalized from ketoacidosis was in fifth grade,

although she has been hospitalized on other occasions when her blood sugar has

gotten too low.  When that occurs, she sometimes can't see, talk, or walk.  Her

limbs have gone numb, and she has needed people to hold her down to give her

sugar.  On the other hand, when it gets too high, she gets incoherent, tired, and

distracted.  Sears testified that she has been using an insulin pump since 2002.

Prior to that, she was giving herself nine shots each day.  It worked fairly well for

the first two years, but now it does not control the fluctuation of her sugar levels

very well.  Her endocrinologist is Dr. Abraham Phillips, and he has been treating

her over the phone without charging her because of her lack of health insurance.

The ALJ also called a vocational expert ("VE"), Gary Weemholt, who had

been provided with and reviewed Sears's file, including her past work history.  The

ALJ asked about Sears's employment potential assuming the following

hypothetical: she could not lift anything over twenty pounds, but she could lift

items up to twenty pounds frequently.  The VE concluded that she could continue

her past employment as a cashier, and could also work in various other jobs such as

an information clerk (including a receptionist or a security screen monitor) or a

motel clerk.

The ALJ then asked the VE about employment potential if he credited Sears's testimony that her blood sugar levels would cause her to either leave the work station to lay down or to be unable to attend work at all. The VE concluded that such a person would be unable to maintain employment.

## Medical Records

According to medical records from Sears's primary treating endocrinologist, Dr. Phillips, she has had diabetes since she was eighteen months old and has been insulin dependent for 23 years. Because of her diabetes, Sears is currently using an insulin pump in order to better regulate her blood sugar levels.

On April 12, 2005, Sears went to the University of Missouri Urgent Care Center for lower back pain and painful urination. She was told to use a heating pad and prescribed Flexaril and Voltaren. Later in the evening, she returned to the emergency room because the pain was increasing, so she was prescribed Percocet. On April 16, 2005, she returned to the emergency room, and an X-ray showed mild disk space narrowing at the L4-5 level with straightening, suspicious of spasms. The radiologist's conclusion was that Sears possibly suffered from mild degenerative disk disease. On April 18, 2005, she was experiencing nausea and vomiting, perhaps as a result of the medications. She was referred to

endocrinology for management of her diabetes, and her prescriptions were changed.

On April 25, 2005, she saw Dr. Michael J. Szewczyk to follow up on her back pain, specifically regarding a determination of whether it resulted from a work injury. He concluded that although she reported hurting her back while shelving books at work, this information did not appear in any of her medical records and her injury was not consistent with such activity. She reported that the pain was getting better, so he recommended that she follow up with her primary care doctor and consider physical therapy. He also limited her to lifting ten pounds for one week, twenty pounds the following week, and then she could return to normal duty.

In August 2005, Sears was involved in a car accident, and she was transported to the hospital because of complaints about neck soreness. A CT scan showed facet sclerosis at L5-S1 and mild levoscolosis of the spine, with the overall conclusion that she may suffer from mild degenerative change of the facets.

Sears injured her wrist while at work in January 2006. She saw Dr. McElroy, her primary care physician, for resulting wrist pain and numbness, and was prescribed ibuprofen and the use of a wrist brace. In February 2006, she saw a specialist, Dr. Kinderknecht, for this problem, and she was diagnosed with De

Quervain's tenosynovitis of the right wrist. She was told to ice her wrist, increase her ibuprofen prescription, and wear a thumb spica splint. A few weeks later, she received a cortisone shot for this problem. By March 2006, the pain had significantly decreased, and she no longer needed to wear the wrist splint.

Also in March 2006, Sears went to the emergency room because of abdominal pain. An ultrasound showed thickening of the gallbladder wall, which is an indeterminate finding that may indicate hypoalbuminemia or hypoproteinemia, and she was sent home with care instructions for possible cholelithiasis, or gallstones. In May and June of 2006, she sought medical care several times for problems with nausea, stomach pain, and allergies. Her blood sugars were not controlled during this time period.

By August 2006, Sears was again suffering from pain in her right wrist. Dr. Kinderknecht recommended resuming use of the spica brace and referred her to physical therapy, and also suggested regular use of ice and ibuprofen. This pain continued and increased throughout September 2006. She saw her doctor in September 2006 and complained of anxiety. She reported that depression had been a longstanding issue for her due to childhood abuse, but that Zoloft had been working fairly well. She was additionally prescribed Klonopin for anxiety.

In October 2006, she followed up with Dr. Kinderknecht again.  She continued to have pain and tenderness despite her continued use of the thumb spica brace, so she received another injection and talked about the possibility of surgery. By December 2006, her pain did not seem entirely consistent with De Quervain's tenosynovitis, so her doctors prescribed an MRI scan.  It showed a ganglion cyst along her wrist.  On December 19, 2006, Dr. Eckenrode performed a De Quervain's release of her right wrist in an attempt to relieve the pain.  This wound healed properly, and she did not require any follow up treatment for her right wrist.

In February 2007, Sears saw Dr. Davis for cold symptoms and swollen lymph nodes that had been present for four weeks.  She told him that her blood sugars had been running high for two days.  Two weeks later, she sought medical treatment for swelling of her lips and tongue as a result of medications she was taking for a staph infection.  In March 2007, she experienced nausea, headache, and pain in her side, believed to be caused by a stomach flu.  In October 2007, she went to the emergency room for abdominal pain as a result of constipation, and the problem was resolved after she received an enema.

Sears went to the emergency room again in April 2008 with complaints of a rash that began in September 2007, which consisted of lesions over her entire body that itched and burned.  Around May 2008, Sears became pregnant.  In June 2008,

she returned to the emergency room for abdominal pain, and an ultrasound showed an ovarian cyst.

In June 2008, Sears started a diabetes self-management program. She reported that her blood sugars that month had ranged from 19 to 382, and her husband had found her unresponsive at one point. Sears also participated in the Continuous Glucose Management System service at Boone Hospital Center in order to closely monitor her diabetes during her pregnancy. Dr. Jamison reviewed her blood sugar levels over a period of time and trained her on proper eating habits and use of the bolus wizard to control her insulin intake. In July 2008, she again reported that depression had been a long-term issue for her, but she did not have suicidal symptoms and did not appear to be depressed at that time.

By September 2008, her diabetes and pregnancy were being regularly monitored. She had switched insulin types from Novolog to Humalog, but she was not appropriately using her bolus wizard or eating well for her conditions. From September through December, Sears's blood sugars were not controlled, often very high with occasional lows. In November 2008, her fetus was evaluated for heart abnormalities, and a biventricular hypertrophy likely caused by mismanagement of her diabetes was detected, which was expected to regress to a normal range within six months of the child's birth.

Sears received a new insulin pump in January 2009. Her blood sugar levels became more controlled, but she still experienced frequent lows. This continued through February 2009. On February 2, 2009, Sears developed preeclampsia and nonreassuring fetal heart rate, and she underwent a cesarean section. After her baby was born, Sears discontinued her diabetes self-management education program and failed to attend any more sessions, despite multiple attempts to contact her.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 2542 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's

decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the claimant's education, background, work history, and age;

(3)     the medical evidence from treating and consulting physicians;

(4)     the claimant's subjective complaints relating to exertional and non-exertional impairments;

(5)     any corroboration by third parties of the plaintiff's impairments; and

(6)     the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R.

404.1505(a); 20 C.F.R. 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the commissioner must decide if the claimant is engaging in substantial gainful activity.  If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national

economy.  If not, the Commissioner declares the claimant disabled.  § 20 C.F.R.
404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is
never free to ignore the subjective testimony of the plaintiff, even if it is
uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d
1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's
subjective complaints when they are inconsistent with the record as a whole.  *See,
e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990).  In considering the
subjective complaints, the ALJ is required to consider the factors set out by *Polaski
v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and
> treating and examining physicians relating to such matters as:
>
> 1.      the claimant's daily activities;
>
> 2.      the duration, frequency, and intensity of the pain;
>
> 3.      precipitating and aggravating factors;
>
> 4.      dosage, effectiveness and side effects of
>         medication;
>
> 5.      functional restrictions.

*Id.* at 1322.

# The ALJ's Findings

The ALJ found that Sears was not disabled within the meaning of the Social Security Act from September 1, 2007 through the date of the decision. He issued the following specific findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.     The claimant has not engaged in substantial gainful activity since September 1, 2007, the amended alleged onset date (20 CFR § 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: diabetes mellitus and right wrist tenosynovitis (20 CFR § 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR § 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR § 404.1567(b) and 416.967(b).

6.     The claimant is capable of performing her past relevant work as a cashier. This work does not require the performance of work-related activities precluded by the claimant's residual functioning capacity for light work (20 CFR § 404.1565 and 416.965).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2007 through the date of this decision (20 CFR § 404.1520(f & g) and 416.920 (f & g)).

The ALJ doubted the credibility of Sears's testimony regarding the intensity, persistence, and limiting effects of her symptoms to the extent that the testimony was inconsistent with the residual function capacity determination. The ALJ found that Sears was not precluded from performing light work because of her diabetes or tenosynovitis. Though he noted that the combination of her medical conditions would likely cause symptoms, they were not so debilitating as to prevent her from working. Therefore, the ALJ determined that Sears was not disabled.

## Discussion

When reviewing a denial of Social Security benefits, a court cannot reverse an ALJ's decision simply because the court may have reached a different outcome, or because substantial evidence might support a different outcome. *Jones ex rel. Morris v. Barnhard*, 315 F.3d 974, 977 (8th Cir. 2003); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court's task is a narrow one: to determine whether there is substantial evidence on the record as a whole to support the ALJ's decision. 42 U.S.C. § 405(g); *Estes v. Barnhard*, 275 F.3d 722, 724 (8th Cir. 2002). On appeal, Sears raises three issues. First, she claims that the ALJ's residual functional capacity determination is not supported by substantial evidence, because there was no medical evidence in the record regarding Sears's work-related limitations. Second, she claims that the ALJ failed to fully and properly evaluate

Sears's mental health, as there was not enough evidence in the record to make an informed determination. Finally, she claims that the ALJ did not properly evaluate Sears's subjective complaints. Because I find that the decision denying benefits was supported by substantial evidence, I will affirm the decision.

<u>ALJ's Determination of Claimant's Residual Functional Capacity</u>

The claimant's arguments concerning the ALJ's consideration of her work-related limitations and her mental health constitute an overall challenge to the ALJ's determination of her residual functional capacity. A claimant's residual functional capacity is what he or she can still do despite physical or mental limitations. 20 C.F.R. pt. 404.1545(a); *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). Although the ALJ is not limited to considering only medical evidence in making this assessment, the ALJ is "required to consider at least some supporting evidence from a professional," because a claimant's residual functional capacity is a medical question. *Lauer*, 245 F.3d at 704.

Here, the ALJ determined Sears has the residual functional capacity to: frequently lift up to ten pounds; occasionally lift up to twenty pounds; stand and walk for six of eight work hours; sit at least six of eight work hours; and push or

17

pull on arm and leg controls.  Sears argues that the ALJ failed to fully and fairly develop the medical evidence regarding her functional limitations and mental health in making this residual functional capacity determination.

Physical Limitations:

Specifically, Sears requests remand for the purpose of ordering a consultative examination regarding her work-related limitations.  "Because the social security disability hearing is non-adversarial, . . . the ALJ's duty to develop the record exists independent of the claimant's burden in the case."  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  This duty includes the ordering of a consultative examination when such an evaluation is necessary for an informed decision.  *Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001).  Although the ALJ "must neutrally develop the facts," the ALJ need not "seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped."  *Stormo*, 377 F.3d at 806.  The ALJ also need not order a consultative examination if the record contains substantial evidence to support the ALJ's decision.  *Haley*, 258 F.3d at 749.

Here, Sears did not present any evidence from a treating or consultative physician stating that she was disabled or unable to work, outside of the time during which she was pregnant, despite the expansive medical records presented to

the ALJ.  The ALJ determined that the absence of such a statement was "consistent with the evidence as a whole."  Contrary to the claimant's contentions that the ALJ "relied extensively on a statement from the Plaintiff's doctor that she was not disabled" and "further relied upon another statement from a treating physician" that he did not disable her outside of pregnancy, it is clear from the ALJ's analysis that he took many other factors into consideration:

> The claimant was able to work for years with her insulin pump.  Her case did become more complicated when she was pregnant, but that did not last 12 continuous months.  Since her delivery there is no evidence of diabetic complications.  She was offered specialized diabetic treatment following her delivery but has not utilized it.  That would tend to indicate that her diabetes mellitus has not been too problematic since then.  Her wrist symptoms resolved with treatment. Her back has never bothered her for very long.  Her depression and asthma are well controlled.  There is no medical documentation of a severe neuropathy or an ongoing wrist problem that would interfere with her ability to use her hands.

Despite the absence of statements from doctors specifically addressing Sears's work-related limitations, the medical records clearly show that her impairments do not rise to the level of disabling her.

Regarding her right wrist tenosynovitis, Sears has not sought any treatment for the problem since her surgery in January 2007, despite instructions to return to the surgeon in the event that any problems arose.  By her own testimony in the hearing, she stated that she could lift her child, who weighed fourteen pounds at the

time.  This ability is consistent with the ALJ's determination that she could perform light work.  The medical records clearly described the extent of the claimant's wrist condition, and a consultative examination was not necessary.

Sears's diabetes appears to be her most severe impairment.  Her diabetes has been a nearly life-long condition, and Sears presented no evidence that her diabetes has gotten any more severe throughout the time of this disability period than it has been in the past.  She has held steady employment in the past, even while using the insulin pump.  Despite her testimony that she lost employment because of missing too much work when her blood sugars were out of control, she was able to keep several of these positions for a period of years.  This fact is inconsistent with her claims that she is unable to make it to work frequently enough to maintain employment.

Sears's testimony regarding the severity of her diabetes is further contradicted by her apparent noncompliance with medical instructions regarding treatment of the condition.  Even throughout the time she was receiving heavy monitoring of her diabetes throughout her pregnancy, she repeatedly failed to eat correctly for her condition, administer the proper amounts of insulin, or count her carbohydrate intake.  "A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility." *Guilliams v. Barnhart*, 393 F.3d 798, 802

(8th Cir. 2005) (internal citation omitted); *see also Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) ("[A]n ALJ may properly consider the claimant's noncompliance with a treating physician's directions, including failing to take prescription medications, seek treatment, and quit smoking.") (internal citations omitted). Undoubtedly, Sears's noncompliance with medical directives contributed to her inability to control her blood sugars. Furthermore, her failure to seek follow-up treatment following her pregnancy contradicts her testimony that she is unable to control her blood sugar levels.

Nothing in the medical records contradicts the ALJ's findings that Sears is able to perform light work, assuming she follows the treatment prescribed for her diabetes. The evidence shows that the ALJ appropriately evaluated her residual functional capacity based on her work-related limitations. Because the record contains substantial evidence to support the ALJ's findings that her physical ailments do not constitute a disability, a consultative examination is not necessary in this case.

Mental Health:

Sears also argues that the ALJ failed to fully and fairly develop the record regarding her mental impairments. The Commissioner has supplemented the five-step sequential process with regulations dealing specifically with mental

impairments.  20 C.F.R. § 404.1520a.  First, the Commissioner must evaluate the

claimant's pertinent symptoms, signs, and laboratory findings to determine

whether the claimant has a medically determinable impairment; and specify such

symptoms, signs, and laboratory findings substantiating the presence of such

impairment.  20 C.F.R. § 404.1520a(b)(1).  The Commissioner then must

determine the severity of the impairment.  To do so, the Commissioner is required

to rate the degree of functional loss the claimant suffers as a result of the

impairment in the areas of daily living; social functioning; concentration,

persistence, or pace; and episodes of decompensation.  20 C.F.R. §

404.1520a(c)(3).

> When we rate the degree of limitation in the first three functional
> areas (activities of daily living; social functioning; and concentration,
> persistence, or pace), we will use the following five-point scale: None,
> mild, moderate, marked, and extreme.  When we rate the degree of
> limitation in the fourth functional area (episodes of decompensation),
> we will use the following four-point scale: None, one or two, three,
> four or more . . . .
>
> . . . .
>
> If we rate the degree of your limitation in the first three functional
> areas as "none" or "mild" and "none" in the fourth area, we will
> generally conclude that your impairment(s) is not severe . . . .

20 C.F.R. § 404.1520a(c)(4)-(d)(1).

If the mental impairment is determined to be "severe," the Commissioner must then determine if it meets or equals a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). This is done "by comparing the medical findings about [the] impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder." *Id.* If the severe impairment does not meet or equal a listed mental disorder, the Commissioner then performs an RFC assessment. 20 C.F.R. § 404.1520a(d)(3).

In this case, the ALJ determined that Sears's depression did not constitute a severe impairment, and I agree. He made this determination by explaining that Sears "did not show that her social functioning, activities of daily living, or concentration, persistence or pace are more than mildly impaired by a mental impairment." Additionally, she has not alleged any extended episodes of decompensation. The testimony and medical records showed that her depression was controlled with treatment. Thus, he concluded that her depression did not constitute a severe impairment, and it therefore did not prevent her from working. *See Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009) ("An impairment which can be controlled by treatment or medication is not disabling." (citation and internal quotation marks omitted)).

The medical evidence and testimony by the claimant adequately supported the ALJ's determination that Sears's depression did not constitute a severe impairment. Several of her primary care doctors noted in medical records that depression was a long-standing issue for her. However, during the period of disability claimed by Sears, she only received Zoloft for her depression and Klonopin for anxiety. She never reported suicidal symptoms, and she did not receive specialized treatment for this condition during the period of disability. Though she received six sessions of psychotherapy in 2006, it predates her alleged onset of disability and appears to be an isolated course of treatment. Finally, she was able to hold steady employment in the past, and she did not report any instances in which she was terminated or quit any jobs because of her depression. She did not present any evidence to demonstrate that her depression is any more severe now than it has been in the past. Thus, because the medical evidence adequately supported the ALJ's decision that her depression did not constitute a severe impairment, remand on that basis is not appropriate.

ALJ's Determination of Claimant's Subjective Complaints and Credibility

Evidence of pain and severity of other symptoms is necessarily subjective in nature. Therefore, an ALJ must look to more than just objective medical evidence, or the lack thereof, in determining whether and to what extent a claimant's

symptoms affect the ability to perform work-related activities. *Halpin v. Shalala*, 999 F.2d 342, 346 (8th Cir. 1993); *Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991). Under the framework set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984), an ALJ must fully consider all evidence relating to the subjective complaints, including the claimant's work record, as well as observations of the claimant by others (including treating and examining doctors) as to such matters as daily activities; the intensity, duration, and frequency of the symptoms and conditions causing and aggravating the symptoms; and functional limitations. *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008). An ALJ must consider these matters but does not have to discuss each one of them in relation to the claimant. An ALJ is permitted to discount the claimant's complaints if they are "'inconsistent with the evidence as a whole.'" *Id*. (quoting *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007)). When discounting a claimant's complaints, the ALJ is required to "detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Ford*, 518 F.3d at 982 (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)).

Here, the ALJ properly considered Sears's testimony and made credibility findings supported by the evidence in the record. The ALJ determined that Sears's testimony was not credible in part because there was a lack of medical evidence

supporting her claims. Although an ALJ may not discount testimony solely due to a lack of medical evidence, this is one factor that may properly be considered. *Halpin v. Shalala*, 999 F.2d 342, 346 (8th Cir. 1993). The ALJ noted that Sears's own testimony established that she was able to care for herself and her daughter, and to carry out most daily living activities. She was also able to hold steady employment for most of her adult life. Additionally, her own noncompliance with treatment directions undermined her credibility. On several occasions, she failed to manage her diabetes by not eating appropriately or using her insulin pump correctly, and she smoked for much of her alleged disability period despite directions that she needed to stop that practice. She also failed to seek follow-up treatment for her wrist or her diabetes, which is inconsistent with her statements that these conditions prevent her from working. Finally, her own testimony in front of the ALJ was inconsistent regarding her daily activities, as she changed her testimony to reflect a greater ability to perform these functions in response to additional questioning by the ALJ. This evidence supports a finding that Sears's testimony as to her limitations was not credible.

For the reasons discussed above, I find that the decision denying benefits was supported by substantial evidence, and I will affirm the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying benefits is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 13th day of February, 2012.